**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRENDA K. YARRISON | : | |
| 7308 Cheryl Avenue | : | |
| Kingsville, MD 21087, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | No. |
| | : | |
| STEAM INTO HISTORY, INC. | : | |
| 2 West Main Street | : | [FILED ELECTRONICALLY] |
| New Freedom, PA 17349, | : | |
| | : | Jury Trial Demanded |
| Defendant | : | |

## COMPLAINT

Plaintiff, Brenda K. Yarrison ("Plaintiff"), by and through her attorneys, Shumaker Williams, P.C., state the following Complaint against Defendant, Steam into History ("Defendant" or "SIH"), and in support thereof states the following:

## PARTIES

1.     Plaintiff, Brenda K. Yarrison, is an adult individual residing at 7308 Cheryl Avenue, Kingsville, Maryland 21087.

2.     Defendant, Steam into History Inc., is a non-profit organization registered to do business in the Commonwealth of Pennsylvania with a business address of 2 West Main Street, New Freedom, Pennsylvania 17349.

3.     To the extent that other individuals or entities may be liable to Plaintiff for the causes of action set forth herein, Plaintiff reserves the right to amend this Complaint to add such parties.

## JURISDICTION AND VENUE

4.     The claims in this action arise under the copyright laws of the United States, 17 U.S.C. § 101, et seq., and substantially related laws of the Commonwealth of Pennsylvania.

5.     This Court has jurisdiction over Plaintiffs' claims for relief under 17 U.S.C. §§501, et seq. pursuant to 28 U.S.C. §§1331, 1338(a), and 1400(a).

6.     This Court has personal jurisdiction over Defendant because, upon information and belief, Defendant is present and doing business in the Commonwealth of Pennsylvania, either directly, or through its agents.

7.     Venue in this District is proper pursuant to 28 U.S.C. §1391(b) and (c) because Defendant does business in this District, and a substantial part of the relevant events or omissions giving rise to Plaintiffs' claims occurred in this District.  Defendant is using and performing the infringing copyrighted material in this District.

## BACKGROUND AND FACTS

8.     Paragraphs 1 through 7 above are incorporated herein by reference as if set forth below in their entirety.

9.     Plaintiff is the sole creator, owner and administrator of three narrative compositions entitled "Narrative 2013," "Christmas Narrative," and "Narrative 2014" (the "Narratives").   The Narrative 2013 and Christmas Narrative are collectively attached hereto and incorporated herein as Exhibit "A" and Narrative 2014 is attached hereto and incorporated herein as Exhibit "B."

10.     These compositions are subject to copyright registrations with the United States Copyright Office.  Narrative 2013 and Christmas Narrative were registered together as one copyright, which copyright registration is attached hereto and incorporated herein as Exhibit "C."  Narrative 2014's copyright registration is attached hereto and incorporated herein as Exhibit "D."

11.     Plaintiff is the sole owner of the reproduction, performance, and distribution rights of the Narratives and is entitled and authorized to protect them against copyright infringement, including the enforcement of copyright actions.

12.     From the date of creation through the dates of registration and application, Plaintiff complied in all respects with the Copyright Act of 1976 and all other laws governing copyright with respect to the copyrights identified above.

13.     As described in more detail below, Defendant has been improperly copying, distributing, and performing Plaintiff's narratives, in violation of Plaintiff's copyright protection since September 14, 2014.

14.     Defendant SIH is an organization that operates a tourist railroad along the Northern Central Railway Corridor in Pennsylvania.

15.     A portion of the mission of the Defendant organization is to inform its passengers about the role York County played in Civil War history and the role the Northern Central Railway played in the growth of York County municipalities.

16.     Plaintiff began researching the history of the Northern Central Railway corridor ("NCR trail") 17 years ago while employed as a Historical Interpreter/Seasonal Naturalist for the Gunpowder Falls State Park ("GFSP")/Northern Central Rail Trail Area in Maryland.

17.     While working along the NCR trail in Maryland, Plaintiff wrote and delivered historical narratives and programming about the NCR trail that were very well received.

18.     Plaintiff worked in this capacity for the GFSP/NCR for 12 years. Plaintiff is a Northern Central Railway history enthusiast and has a passion for Civil War history of the area. Plaintiff is also a bike riding enthusiast and frequently utilizes the Heritage Rail Trail.

19.     Plaintiff became aware of the Steam into History project while biking along the NCR rail trail corridor in Pennsylvania in the summer of 2012. She collected contact information and sought out the organization.

20.     Due to her historical research regarding the Northern Central Railway in Maryland, which was also the rail line to be used by the SIH locomotive in Pennsylvania, Plaintiff felt that she had a skill set and background knowledge to help support their efforts in delivering her knowledge of Northern Central Railway and Civil War history to the patrons of the train. Additionally, her background in the delivery of educational/recreational programming for the Park Service in Maryland gave her the experience with the public, which would be required in entertaining the patrons of the locomotive.

21.     Plaintiff was extremely interested in participating in the SIH project and making a contribution to its success.

22.     Plaintiff became officially involved with the Defendant in October 2012 when she signed up as a volunteer and attended the first general Volunteer Meeting with Defendant prior to the organization's official opening.

23.     During Plaintiff's initial meeting with Defendant, Plaintiff shared her concept of providing a narration for entertainment during train rides.

24.     At this meeting, Mike Beshore ("Mr. Beshore"), a volunteer historian and husband of management team member, Debi Beshore ("Mrs. Beshore"), indicated that it was the intention of SIH to place video screens in each passenger car that would show historic photographs to provide entertainment for the train passengers.

25.     However, Defendant and Mr. Beshore, liked Plaintiff's proposal to create narrations in order to provide a better customer experience on the train.

26.     Plaintiff attended a second meeting with Defendant in January 2013.

27.     At this meeting, Defendant's Chief Operating Officer, Bob Gotwols ("Mr. Gotwols"), announced to the volunteers and/or employees present that Plaintiff would, as an unpaid volunteer, be creating and performing a narration for SIH's train runs.

28.     For a period of about six months, Plaintiff continued to draft and then complete a final version of the first narration for her performance during the train ride. *See* "Narrative 2013" attached hereto and incorporated herein as part of Exhibit "A."  Plaintiff created the Narratives on her own time and never while she was working as a volunteer for Defendant.

29.     During that same time, Mr. Beshore sent Plaintiff six pages of limited historical information for her use. Several of these pages merely included a question mark (?) in certain sections indicating that Mr. Beshore had no information on that location/town.   *See* Mr. Beshore's six-page contribution attached hereto as Exhibit "E."

30.     It is believed that Defendant will attempt to rely on Mr. Beshore's six-pages of notes in its defense to either allege that Mr. Beshore wrote the Narratives or to suggest the Narratives were composed as a joint work of authorship.

31.     Plaintiff's final version of the "Narrative 2013" script was 31 pages.

32.     Plaintiff's Narratives are created in a way that makes use of hyperbole and occasional satirical or fictitious elements to transform the historical fact into an entertaining story for riders.  Plaintiff's stories were also

connected in a unique and creative way with selective vocabulary and word choice.

33.     In an effort to enhance the entertainment value for the patrons of the train, Plaintiff purchased and/or handmade a variety of Civil War clothing and accessories during 2013 and 2014 in support of the SIH efforts.

34.     Plaintiff has invested $7,771.00 in period correct costuming.  In addition, as a volunteer for SIH, Plaintiff logged 3,568 miles traveling to the SIH facilities from her home without reimbursement.

35.     Plaintiff was the only narrator during the opening of Steam into History and, as such, performed her original narration, while dressed in period clothing, for the first public run of Defendant's train on June 2, 2013.

36.     As a result of her efforts, an interview with Plaintiff appeared on the front page of the York Dispatch dated June 3, 2013.

37.     In addition, a portrait of Plaintiff appeared on the front page of the York Daily Record dated June 3, 2013 and numerous You Tube videos including Plaintiff were created that day.

38.     Plaintiff's performances of her historical narrative on the SIH train were very successful and Plaintiff received several positive comments from passengers, as well as the management team at SIH including Mr. Gotwols, Mrs. Beshore, and Hillary Hess ("Ms. Hess").

39.    During the late summer of 2013, Plaintiff asked and received permission to sell homemade brownies on the train. Permission for this was granted by Mr. Gotwols. The homemade brownies were a very popular addition to the excursions.

40.    During 2013, and at all other times relevant to this dispute, Plaintiff's Narratives" were the primary entertainment on all train runs, including those runs that had other/additional entertainment, such as musicians, or other speakers.

41.    While Plaintiff volunteered her services throughout 2013, Defendant began to hire additional narrators to work on the train runs as paid employees without offering monetary compensation to Plaintiff.

42.    While Plaintiff was encouraged to take tips, Plaintiff continued to recite and perform her narration on the train runs without any compensation from Defendant through the end of 2013.

43.    Plaintiff later requested if Steam into History would consider paying her for her narration duties in the following year (2014). The management team agreed to consider this for the 2014 season.

44.    In the fall of 2013, Plaintiff was reporting to work at the Steam into History building, approximately one-half hour before the first run of the

train. As Plaintiff was walking toward Main Street to cross it, she heard a very loud "wolf whistle" directed at her.

45.    This happened in full view of other crew members and of SIH train passengers. Plaintiff looked south down Main Street and saw that it was Mr. Gotwols who had made the whistle, who was leering in the direction of Plaintiff.

46.    One of the passengers that was standing outside the shop inquired to Plaintiff about the identity of the person that had made the "wolf whistle," to which Plaintiff replied that the person making the inappropriate whistle was the COO of the organization.

47.    In the fall of 2013, Mr. Gotwols requested that Plaintiff come to his office and lift up her dress so that he could "examine her shoes." There was one other person in the office, Bruce Warch, a volunteer coordinator.

48.    The reasoning provided by Mr. Gotwols as to why he needed to "examine Plaintiff's shoes" was to make sure that she had on "railroad appropriate" footwear.

49.    Plaintiff had never been given a description or memo of any kind describing what types of shoes were to be worn on the train and had no knowledge of any safety ruling about footwear.

50.     Plaintiff is also not aware that Mr. Gotwols examined anyone else's shoes, or asked any other women into his office to lift up their dresses or look at their shoes.

51.     Plaintiff experienced extreme discomfort and humiliation and was taken aback by Mr. Gotwols' dictate that she "lift up her hoopskirt" for him.

52.     During November 2013, Plaintiff wrote an additional narration "Christmas Narrative" for use on special holiday trains called the "Steam into Christmas Past" runs.

53.     During this time, Mr. Beshore provided Plaintiff with two illegible handwritten pages of information about Christmas traditions and two pages of information that he had copied from a reference book. None of this information was utilized by Plaintiff.  Plaintiff's final version of the "Christmas Narrative" was 14 pages long.

54.     Plaintiff completed this narration completely independently and it is an original work of authorship subject to copyright protection.

55.     This narrative eventually became the primary entertainment, besides visits from Santa Claus, on all holiday trains in December 2013 and December 2014.

56.     It was not until March 2014 through July 2014 that Plaintiff was compensated for her services as a narrator on Defendant's train runs. At no point did Defendant negotiate or purchase from Plaintiff a license for the use of any Narratives nor was Plaintiff's receipt of employment income understood or intended to convey such a license to Defendant or any of Defendant's volunteers or employees.

57.     Plaintiff was told to bill the company as a contractor at the rate of $8.00 per hour.  No insurance, social security or taxes were withheld.

58.     At no point was Plaintiff compensated for her creation of the narrations nor reimbursed for expenses incurred in relation to working as a narrator (either as a volunteer in 2013 or as a contractor in 2014).

59.     Defendant provided copies of Plaintiff's narration to the additional paid narrators for use while working their train runs.

60.     In January 2014, Plaintiff received several phone calls from SIH Board member John Riggle ("Mr. Riggle").

61.     Mr. Riggle proposed that Plaintiff create an income stream for the company by surrendering a percentage of her brownie sales to SIH.

62.     Talks continued between Plaintiff and Mr. Riggle, during which Plaintiff agreed to expand the brownie business and to offer a percentage of the profits to SIH.

63.     Plaintiff expanded the brownie business to create "Snacks on the Tracks" including multiple home baked items as well as prepackaged snacks.

64.     On February 17, 2014, Plaintiff also shared an idea with the Steam into History management team for creating a souvenir book that could be sold at the SIH book shop.

65.     During this meeting, Plaintiff displayed a sample souvenir booklet that has been for sale for several decades at the Cass Railroad in West Virginia.

66.     Plaintiff's idea for a souvenir book was well received and encouraged by SIH.

67.     However, it was during this meeting, in a discussion surrounding the creation of her snack business for the train, that Mr. Gotwols made a lewd and sexually suggestive comment to Plaintiff.   Specifically, when Plaintiff described taking snack products to the customers in their seats on the train using baskets, similar to "cigar/cigarette" trays used for selling in clubs, Mr. Gotwols asked Plaintiff if she was going to "wear a Playboy bunny tail on the train" while she was taking the snack basket up and down the aisles of the passenger cars.

68. This statement was made in the presence of Mrs. Beshore and Ms. Hess.

69. Plaintiff was repulsed and severely offended by this comment and made note of it in her meeting notes from that day.

70. For a period of approximately three months, Plaintiff developed her idea, researched, and wrote her souvenir book, "Tales Along the Tracks," with the intention of selling the book in Defendant's gift shop as well as on the train runs.

71. During the time she wrote her book, Plaintiff also worked on revising her original narration, "Narrative 2013," and creating the "Narrative 2014," to incorporate the new content.

72. Mr. Beshore provided no information to Plaintiff during the writing of Plaintiff's book, or during the writing of the "Narrative 2014". The final version of the "Narrative 2014" was 32 pages.

73. During this three-month period between February and May, Plaintiff was in discussions with Defendant and gift shop manager, Ms. Hess, regarding the sale of her book, "Tales Along the Tracks".

74. During this time period, Plaintiff was also involved in negotiations with book printing companies and incurred numerous expenses for the book's production.

75.     Plaintiff completed writing and production of "Tales Along the Tracks" by May 2014.

76.     Defendant and Ms. Hess represented on April 4, 2014 that Defendant would be willing to initially purchase 250 of Plaintiff's books for sale in the SIH gift shop.

77.     It was Plaintiff's understanding that if sales were successful, SIH would purchase additional quantities and offer same for sale in the SIH gift shop.

78.     Based on these discussions, Plaintiff completed a purchase order with the printer for 500 books on or about April 14, 2014.

79.     It was not until the printing order had been placed and the books were in production that Defendant decided to no longer purchase 250 of Plaintiff's books.

80.     Instead, Defendant suggested a consignment deal on or about May 2, 2014, whereby Plaintiff would deliver a set number of books to the gift shop and receive payment from Defendant only after the books were sold.

81.     In addition to the gift shop consignment sales, Plaintiff was permitted to sell her book on the train runs that she narrated.

82.     Between May 2014 and July 2014, Plaintiff sold 353 books in on-board train sales, earning over $2,000.00 in sales.

83.     Average on-board trains sales for this period was approximately 176 books per month.

84.     This on-board train sales opportunity was lost for Plaintiff when she was terminated from SIH.

85.     Between May 2014 and September 2014, Plaintiff sold 175 books in the SIH gift shop.

86.     Average gift shop sales for this period were approximately 44 books per month.

87.     This sales opportunity was also lost for Plaintiff when sales were halted for the gift shop by the management team at SIH on September 28, 2014.

88.     Defendant had earned 40% of all sales of "Tales Along the Tracks" for transactions in the SIH gift shop. Defendant had earned 10% of all sales made by Plaintiff of books sold on the train.

89.     Plaintiff's narration and book were both consistently very well received by customers.

90.     During 2014, Plaintiff ran her "Snacks on the Tracks" business during all her shifts on the train.  Plaintiff purchased all baking goods and

made homemade snacks such as brownies and cookies. This required many hours of baking prior to every shift on the train. Plaintiff also purchased flat baskets, money boxes, napkins, and prepackaged snack items such as popcorn and pretzels. Plaintiff carefully packed the snack baskets and transported them to the SIH train for each of her runs. Train patrons enjoyed and positively commented on the baked goods/snacks provided by Plaintiff. Snack sales for the period of March-July 2014 were a total of $706.00. This sales opportunity was also lost for Plaintiff when she was terminated by SIH on July 24, 2014.

91.    During 2013 and 2014, Plaintiff herself was frequently photographed by customers and professional photographers alike. She was interviewed and photographed by several newspapers and magazines as a representative of SIH.

92.    Plaintiff appeared on the cover of "Engines and Engineers" magazine representing SIH, was photographed for October/November 2013 issue of "The Gettysburg Companion," and appeared on the cover of the York County Tourism catalogue for the entire year of 2014 posing near the SIH steam engine.

93.    Plaintiff was also highly rated as positive component of the SIH experience in online travel blogs such as "Trip Advisor."

94.     Additionally, Defendant used Plaintiff's likeness on several types of advertising such as handbills, schedules, and the company Facebook page.

95.     Despite Plaintiff's dedication, enthusiasm and contributions to the SIH project throughout 2013, and her willingness to make many contributions and provide an income stream through sales of her book, and through her business, "Snacks on the Tracks", Plaintiff's professional relationship with Mr. Gotwols began sharply deteriorating in early 2014.

96.     On March 22, 2014 during a meeting at which Plaintiff volunteered her time to train other persons interested in narrating on the train, Mr. Gotwols instigated a particularly vicious and unprecipitated personal attack on Plaintiff.  After questioning Plaintiff several times that morning about the whereabouts of a volunteer, Roger Cutter, and what had happened to cause Mr. Cutter leave the volunteer meeting, Mr. Gotwols located Plaintiff while she was working in the attic storage area of the Steam into History building with Ms. Hess.

97.     Mr. Gotwols indicated in a non-verbal manner for Ms. Hess to leave.

98.   Once alone, Mr. Gotwols verbally accosted Plaintiff by stating that although the customers loved her, "everyone else hated her" and that her "colleagues couldn't stand her."

99.   Despite a lack of evidence, he stated that because of Plaintiff, "everyone was leaving."

100.   Plaintiff left in a distraught manner and was crying as she exited through the public areas of the building.

101.   Plaintiff later determined that Mr. Cutter had in fact left the meeting early that day because he had been verbally abused by Mr. Gotwols.

102.   Plaintiff reported to three crew members/volunteers, (Roger Cutter, Kyle Evans and Mike Billet), what Mr. Gotwols had said to her, and the threatening manner in which he verbally attacked her.

103.   Mr. Gotwols has subsequently denied making any comments as averred above in paragraphs 97-100.

104.   On May 31, 2014, Plaintiff worked all train shifts as a narrator dressed in period clothing. Between train runs that day, several customers approached Mrs. Beshore on the siding near the trains and complimented Plaintiff and her narration skills. Mrs. Beshore was overheard stating, "Yes, Brenda is the best we have!"

105.  Later that same day, May 31, 2014, Mr. Gotwols, Mrs. Beshore and Ms. Hess requested a meeting with Plaintiff after her shift on the train. During that meeting Plaintiff was again accused of causing other employees of Steam into History to quit because of statements that Plaintiff had purportedly made.

106.  The following day, June 1, 2014, a letter was sent via email to Plaintiff, as well as to D. Reed Anderson ("Mr. Anderson"), President of the Board of Directors, and to Ann Wileczek ("Ms. Wileczek"), with SIH Human Resources, to be placed in Plaintiff's personnel file regarding alleged "poor relations with other volunteers and employees at SIH. *See* letter attached hereto as Exhibit "F."

107.  Plaintiff was not provided with any specific details at the time, of any occurrence referenced in the June 1, 2014 letter.

108.  In a telephone conversation with Mrs. Beshore on June 1, 2014, Plaintiff was told that the complaints were alleged to be related to Plaintiff by/from "Laurie, Elaine, Kim and some guy that 'just disappeared' with no reason."  During that phone conversation, Mrs. Beshore stated that she personally thought Plaintiff was "wonderful," and further intimated that complaints might be attributed to "the caliber of people that we are dealing with" as volunteers.

109. Several days after the May 31, 2014 meeting with Plaintiff, one volunteer, Kim, who had expressed a desire to quit, was interviewed by the SIH management team and volunteer coordinators.

110. Upon information and belief, that volunteer shared that statements were made to her by Roger Cutter which caused her to desire leaving SIH, not any statements made by Plaintiff.

111. Plaintiff was never informed of the results of this investigation, nor was the June 1, 2014 personnel letter rescinded.

112. Additionally, it is not believed that Laurie and Elaine were interviewed by the management team and continued to volunteer at SIH throughout the 2014 season, despite Mr. Gotwols' assertion that Plaintiff had caused them to leave.

113. It is further believed that Elaine has stated publically that she never made statements to anyone to the effect that she preferred not to work on train runs with Plaintiff.

114. The volunteer who allegedly "just disappeared" was never named to Plaintiff.

115. Despite her considerable contributions, and the provision of multiple income streams to the company via her book and snack business, it has been reported by Sheryl Williams ("Ms. Williams"), an employee of SIH,

that during the summer of 2014, Mr. Gotwols began making extremely defamatory comments in public areas of the Steam into History shop about Plaintiff.

116.  These comments included statements that Plaintiff was a "diva, starved for attention, bossy, had no people skills, and was extremely demanding."

117.  This same employee also reported hearing Ms. Hess make statements to the effect that Plaintiff was "completely monetizing a position that was intended to be volunteer," despite Plaintiff working as a volunteer through all of 2013 while all other narrators were paid.  This employee also reported that Mrs. Beshore and Ms. Hess made statements in 2013 that Plaintiff was having an affair with a member of the train crew.

118.  These statements were made in common areas of the SIH facilities, including the gift shop area, and not in any way inside the confines of privileged conversations.

119.  The train narration schedule for June and July 2014 began to reflect a decreased number of days for Plaintiff to work.

120.  One other narrator, Theresa Strange, had 18 dates scheduled and Plaintiff had seven days scheduled.

121.  Plaintiff contacted Mrs. Beshore and offered to rewrite the schedule so that it would be more equitable.

122.  Plaintiff created a schedule and sent it to Mrs. Beshore for review. The sample revised schedule had 13 days for the other narrator and 12 work days for Plaintiff.

123.  Defendant and Mrs. Beshore refused Plaintiff's request for a more equitable work schedule, and the schedule remained unchanged.

124.  Further, Theresa Strange reported that Mrs. Beshore and Ms. Hess had told her that Plaintiff was "making up [Theresa's] schedule and trying to steal all of her work days."

125.  Such a statement is untrue because Plaintiff does not handle the scheduling of employees and volunteers.

126.  These disparaging comments by members of the management team eroded Plaintiff's relationships with her co-workers and damaged her reputation.

127.  On July 24, 2014, Plaintiff arrived to Steam into History, dressed in period clothing, ready to begin her scheduled shift.

128.  Plaintiff was pulled into an office with Mr. Gotwols and Mrs. Beshore and informed her that her services at Steam into History were no longer needed.

129. During this meeting, Mr. Gotwols would not provide a reason for his termination of Plaintiff.

130. When specifically asked for a reason by Plaintiff, Mr. Gotwols stated Pennsylvania is an "at-will" state and he was not required to provide a reason.

131. Plaintiff was told to take all her belongings and leave at that time. Mrs. Beshore walked Plaintiff to her car.

132. When Plaintiff asked what would happen to her book sales in light of her termination, Mrs. Beshore stated that they would really like to keep selling them, because the books were "such a wonderful marketing tool for the company."

133. After her termination on July 24, 2015, Plaintiff contacted the President of the Board, Mr. Anderson, to report Mr. Gotwols' pattern of behavior toward her, and ask for support in being reinstated as a narrator at SIH.

134. Plaintiff also contacted Mrs. Judy Simpson, a benefactor to SIH, as well as Ms. Wileczek, SIH Human Resources, to discuss Mr. Gotwols' ongoing harassment and abusive patterns of behavior.

135. It is believed, and therefore averred, that no action was taken as a result of these reports.

136. After Plaintiff's termination, Ms. Williams wrote a letter to the Board of Directors at SIH reporting her observations of how Plaintiff was being treated by the management team and also about the toxic climate that was being created by Mr. Gotwols and the management team.

137. This letter was sent by Plaintiff to Mr. Anderson, Board Member, Seth Noll ("Mr. Noll") and Ms. Wileczek on August 2, 2014.

138. It is believed and therefore averred that four additional letters were written by customers, photographers and reenactors on behalf of Plaintiff describing her skills, passion and dedication to the company.

139. These letters were forwarded to Mr. Anderson and Mr. Noll on or around July 30, 2014.

140. It is believed and therefore averred that the Board of Directors took no action with regard to Ms. Williams' letter.

141. Mr. Gotwols responded to Ms. Williams' letter by telling other employees at SIH that Ms. Williams had "decided to leave the organization," thereby effectively terminating her.

142. Ms. Williams' termination was reported to Mr. Noll by Plaintiff via email on August 6, 2014.

143. On September 8, 2014, Plaintiff was given information that a frequent passenger, Julianna Love ("Ms. Love"), who had previously

supported Plaintiff, but who was now in close contact with the management team at SIH, had been sharing disparaging comments about Plaintiff and insinuating that Plaintiff was having an affair with a photographer, Mike Zortman.

144. When contacted by Plaintiff via telephone and confronted with this information, Ms. Love screamed and swore at Plaintiff and hung up.

145. Ms. Love then later responded via email, and insinuated that the information was told to her by the management staff at SIH.

146. Ms. Love sent this information to Plaintiff via an email address provided by Plaintiff's employer.

147. Because of the unauthorized use of Plaintiff's work email address, Plaintiff was compelled to report the email from Ms. Love, and its contents to her employer of 25 years, Baltimore County Public Schools.

148. Plaintiff was, and continues to be, concerned that this email painted her in a very bad light with her Baltimore County Public Schools supervisors, and has caused Plaintiff a high level of concern about the impact that these disparaging comments made by and in relation to SIH have had on her regular position of employment.

149. Plaintiff rode the SIH train as a paying customer three times between August 2014 and September 2014.

150. Following those train rides, SIH later sent a handwritten letter to Plaintiff returning her money for all tickets purchased during that time, although she did not request a refund.

151. Additionally in the letter, Mrs. Beshore and Mr. Gotwols stated that they offered the refund due to Plaintiff's "contributions to the success of the company" and further extended an invitation to ride the SIH train free of charge at any time.

152. As a result of the invitation from Mrs. Beshore and Mr. Gotwols, Plaintiff purchased a ticket and rode the train in period costume the next weekend, on September 13, 2014.

153. Upon arriving, Plaintiff boarded the train and spoke briefly with the narrator, Laurie Catalpho ("Ms. Catalpho").

154. After seeing where Plaintiff chose to sit, Ms. Catalpho gathered her belongings and went to sit in another car.

155. Plaintiff saw Phyllis Prodan ("Ms. Prodan"), who was car hosting that day, and with whom Plaintiff had never met or worked with at SIH.

156. Plaintiff extended her hand and said, "Hi, I'm Brenda," to which Ms. Prodan gruffly responded "I know who you are!"

157.  Plaintiff sat with reenactors from the 87th PA. Regiment and participated in role playing of a Union/Confederate "encounter" while on the train.

158.  Plaintiff also participated in a historical display that was set up at the Hanover Junction museum at the terminus point of the train.

159.  Multiple photographs were taken of Plaintiff engaging in these historical/reenactment activities during that day (September 13, 2014).

160.  On this trip, Plaintiff was approached by several riders and answered customer questions about tickets, schedules and events.

161.  Plaintiff was also asked to pose for photographs with numerous patrons of the train.

162.  Between the two runs of the train that day, the train conductor, Mike Billet ("Mr. Billet"), was called into Mr. Gotwols office and interrogated.

163.  Mr. Gotwols stated to Mr. Billet that he hoped Mr. Billet's "affair" with Plaintiff was over.

164.  Mr. Gotwols indicated that he was surprised/disgusted with Mr. Billet that he "could not control himself around" Plaintiff.

165.  Mr. Gotwols also indicated that he was the model of restraint, because he himself had not had relations with his own wife in over 20 years.

166.  No such affair between Plaintiff and Mr. Billet ever occurred.

167. It is believed, and therefore averred, that despite no affair ever having occurred, and without evidence or proof to establish the same, Mr. Gotwols continued to openly discuss such an alleged affair in an attempt to defame Plaintiff's reputation.

168. During that same day, while car hosting on the train, Phyllis Prodan, harassed and stalked Plaintiff on the second train run of the day.

169. Ms. Prodan yelled at Plaintiff to "get in a seat" even before the train was moving and would not allow her to walk to the bathroom by herself.

170. As car host, Ms. Prodan created a scene on the train that was disruptive and abusive toward Plaintiff and caused extreme embarrassment and mental anguish.

171. Other customers extended their sympathy and offered to Plaintiff, "Here, you can sit with us, WE'RE nice."

172. The disruption caused by Ms. Prodan that day was so severe that the train conductor was forced to intervene.

173. The train conductor interrupted passenger service to hold the train at Glen Rock and questioned the car host about her behavior.

174. At that time, Ms. Prodan admitted that she was ordered by Mr. Gotwols to watch Plaintiff all day, and report back to him.

175.  Additionally, between runs of the train that day, it is believed that Mr. Gotwols also called the narrator, Ms. Catalpho, into his office to question her about Plaintiff's actions on the train and asked her to "watch" Plaintiff.

176.  It is believed that although Mr. Gotwols earlier claimed that Plaintiff was causing volunteers to leave SIH, Ms. Catalpho has since stated that she has quit SIH because she was forced to do this by Mr. Gotwols.

177.  It is believed that Ms. Catalpho now works only sporadically at SIH when a high need arises on their part.

178.  Plaintiff was completely humiliated by the treatment she received on that day. Not only did passengers on the train comment on this treatment, but several other reenactors witnessed this treatment and have stated that they will never volunteer to reenact for SIH again.

179.  The Dasher family, members of the 87th PA regiment, have refused to come back to the train since that date.

180.  Another volunteer from the 87th PA, Penny Carbaugh, wrote a letter to the Board of Directors on April 4, 2015 to describe the events of that day, and the harassment that Plaintiff endured.

181.  Upon returning home that evening, Plaintiff received an email from Mr. Gotwols stating that due to "*her* disruptive behavior" she was no longer welcome to ride any SIH trains (emphasis added).

182.  Plaintiff appealed to Mr. Anderson regarding being banned from the train, and sent photos to Mr. Anderson that documented her behavior that day.

183.  As a result of Mr. Gotwols' edict banning Plaintiff from riding the SIH train and the harassment that she endured as a paying customer, on September 14, 2014, Plaintiff sent a "cease and desist" notice via email to Mr. Gotwols, Mrs. Beshore and Mr. Anderson stating, that SIH was ordered to stop any and all use, distribution, and performance of any and all parts of the Narratives that Plaintiff had created.

184.  Shortly thereafter, on September 28, 2014, Ms. Hess informed Plaintiff that her souvenir books would no longer be sold in Defendant's gift shop.

185.   Plaintiff has made contact with other tourist railroad companies, specifically Stewartstown Railroad, inquiring about volunteer opportunities.

186.  Plaintiff has offered her services as a narrator to Stewartstown Railroad on October 27, 2014, and specifically stated that she had experience at Steam into History in this capacity.

187.  Plaintiff received a response from the Stewartstown Railroad and was invited to meet on March 29, 2015, with a representative of the Stewartstown Railroad, Dave Watson, at the Stewartstown Railroad station.

188. Despite Plaintiff waiting for 45 minutes alone in a deserted parking lot, Mr. Watson never arrived.

189. Plaintiff contacted Mr. Watson later that day and has never received a response.

190. It was later discovered by Plaintiff that Mr. Watson is a relative of Mr. Gotwols. Despite their continued postings on social media about their need for volunteers, this company has never responded to any other messages from Plaintiff regarding volunteer opportunities.

191. Plaintiff believes and therefore avers that Mr. Gotwols encouraged other train organizations not to allow Plaintiff to work for them.

192. Carl Franz, a photo excursion charter coordinator, requested in early September 2014, that Plaintiff work as a narrator on his crew during a scheduled photo charter on the SIH line. However, Defendant and Mr. Gotwols told Mr. Franz that SIH is not "affiliated with" Plaintiff any longer and that they would rather that Mr. Franz not utilize Plaintiff's services on his photo charter, scheduled for October 29, 2014.

193. Plaintiff was not hired to work on this photo charter because of Mr. Gotwols' remarks.

194.  On November 8, 2014, Plaintiff became aware that a SIH train would be stopping at Hanover Junction station in the Heritage Rail Trail Park, a public venue, for a speech by an Abraham Lincoln reenactor.

195.  SIH had put out a public notice for reenactors to attend this event, in order to populate the crowed with individuals in period clothing, thereby increasing the authenticity of the event.

196.  Plaintiff knew of many friends and former colleagues that would be present during this train stop and was eager to participate in the event as a reenactor.

197.  Despite having been barred from riding on the SIH train, Plaintiff made the considerable investment in time to dress in period clothing for the occasion and to make the drive from her home to Hanover Junction to participate in this public event.

198.  While at the event, she interacted with the passengers and train crew, and posed for photographs with customers.

199.  While Plaintiff was in attendance at this event, Mr. Gotwols also arrived by car.

200.  Plaintiff was closely observed by Mr. Gotwols and it is believed her presence was reported to Mr.  Anderson via cell phone by Mr. Gotwols,

while he was at Hanover Junction and within earshot of several members of the train crew and at least one passenger.

201.  Mr. Gotwols was overheard stating "Brenda's here!" on the phone, despite the fact that Plaintiff was a private citizen attending an event in a public park.

202.  When Plaintiff was leaving this event, she became alarmed to realize that since the train had departed, there were few people left on the premises except herself and Mr. Gotwols.

203.  Plaintiff asked the museum docent to walk her to her car so that she would be safe in not encountering Mr. Gotwols alone.

204.  Plaintiff was told about the phone call made by Mr. Gotwols at the end of the train runs that day.  She reported this behavior immediately by phone to SIH Board Member, Mr. Noll.  Plaintiff also emailed Mr. Noll, Mr. Anderson, volunteer coordinator Bob Dickson, Mrs. Simpson and Ms. Wileczek that same evening, November 8, 2014, regarding the harassment that she experienced at Hanover Junction while attending the speech by the Lincoln reenactor.

205.  Shortly thereafter, the Board informed Plaintiff via certified letter she was not only barred from riding the train, but also banned from future participation in similar events because of "ongoing disruptive activities."

206. On November 25, 2014, Plaintiff discovered that SIH began selling DVDs that included a narration, which Plaintiff believes was based on her book, and used without permission.

207. Further investigation is needed to determine whether Plaintiff's copyrighted works were incorporated into this DVD.

208. SIH continued to use Plaintiff's narrative on board their excursion trains throughout the remainder of 2014.

209. Plaintiff's "Narrative 2014" was the primary entertainment on all train runs during 2014, including those runs that had other/additional entertainment, such as musicians, or other speakers.

210. In January 2015, Plaintiff joined the 87th Pennsylvania Regiment, a reenacting group, in order to have an outlet for her reenacting.

211. During the Spring of 2015, it was proffered by SIH that Mr. Beshore was the original author of the SIH narrative, and that Plaintiff only helped add a "teacher's touch" and "assisted with editing" Mr. Beshore's narration document.

212. On April 9, 2015, Plaintiff arranged for a digital recording to be made onboard a SIH run.

213. In the recoding, one can hear Phyllis Prodan reciting the narration to attendees.

214. An analysis of this recording indicates that substantial portions of Plaintiff's narration was still being used as the primary entertainment and narration on the SIH trains.

215. On or around April 14, 2015, Plaintiff was given a paper copy of the narration being used by SIH for their 2015 season which had allegedly been redrafted to eliminate Plaintiff's copyrighted content. *See 2015 narration attached hereto as Exhibit "G."*

216. This narration contained substantial verbatim sections of Plaintiff's copyrighted narrations, although the information was rearranged in a slightly different order.

217. Plaintiff's copy of the SIH 2015 narration also contained at least one section of material that was repeated in two places, indicating that the compiler of that document had done a "copy and paste" on the document and had neglected to delete the original duplicated section. Plaintiff believes and therefore avers that Plaintiff's original electronic document was used in compiling the 2015 narration by SIH.

218. On June 6, 2015, the History Channel arrived at Hanover Junction to shoot video segments using the SIH train and a variety of reenactors.

219. Plaintiff was riding her bike along the Heritage Rail Trail, and stopped at Hanover Junction to observe this activity. Before riding away, Plaintiff checked with the conductor about when and how the train would be pulled away from the station. She waited at the platform until the train left, so that her bike tires would not be visible between and behind the wheels of the locomotive.

220. Further along the trail, a photographer, John Gensor, asked Plaintiff to ride ahead/southbound along the trail, and stop northbound bike riders from entering the filming area. Plaintiff utilized her time to assist as requested.

221. Upon information and belief, on June 16th, at a York Revolution baseball game, Mr. Beshore, made public comments that Plaintiff had disrupted the History Channel shoot by riding her bike through the shots. It is believed and therefore averred that these comments were made in front of employees and volunteers of the company as well as members of the public who may know Plaintiff.

222. On June 21, 2015, Ms. Prodan, who had ridden the train on June 6, 2015, offered a written statement, disputing Mr. Beshore's comments about Plaintiff and stating that no bike riders disrupted the History Channel video shoot in any way.

223.  On July 19th, 2015, Plaintiff stopped at Hanover Junction to speak with friends during a bike ride along the Heritage Rail Trail. While there, a 16 year old SIH volunteer, Holly Martin ("Miss Martin"), standing on the fringes of Plaintiff's conversation blurted out, "Oh, YOU'RE BRENDA?!" A brief conversation ensued between Miss Martin and Plaintiff.

224.  Upon information and belief, on August 2, 2015, Miss Martin was approached by Mrs. Beshore and Ms. Hess wherein she was interrogated about speaking to Plaintiff and asked about the content of that conversation.

225.  Upon information and belief, when Miss Martin indicated to Mrs. Beshore and Ms. Hess that her conversation with Plaintiff was "not a problem for her" and did not divulge the conversation's contents, Miss Martin was threatened by Mrs. Beshore and Ms. Hess that she (Miss Martin) would "have to speak to the COO of the Company, (Mr. Gotwols) about this".

226.  During July 2015, Plaintiff began working as a volunteer greeter for York County Parks and Recreation.  She now volunteers at the New Freedom train station, and the Hanover Junction train station along the Heritage Rail trail. These two stations are at the terminal ends of the SIH excursion.

227.  On August 8, 2015, while Plaintiff worked her volunteer shift at the Hanover Junction station, the SIH train arrived allowing SIH employees

to see, for the first time, that Plaintiff was working at that station in period attire.

228.  Upon information and belief, within one week, SIH had issued an addendum to the narration, to be read by all narrators arriving at Hanover Junction station. The addendum stated that "there will be a docent at the museum, dressed in period attire to answer all your questions about the railroad and Civil War history."

229. In the past, there had never been an announcement or addendum to the narration including information to that effect prior to that date.

230.  On August 16, 2015, Reb Scavone, a volunteer and a part-time conductor for SIH was called to Mrs. Beshore's office prior to the first train run of the day wherein Mrs. Beshore demanded to know why Mr. Scavone was speaking to Plaintiff along the biking trail earlier that morning.

231.  Upon information and belief, Mrs. Beshore stated, "You have no idea how much trouble THAT WOMAN has caused this company!"

232.  On August 19, 2015, Mr. Billet was questioned by the COO of the company, Mr. Gotwols, about whether or not he still speaks with Plaintiff.

233. On or about that same date, Mr. Billet was sent an email by Mr. Gotwols containing accusations made by Ms. Prodan against Mr. Billet and Plaintiff.

234. Specifically, Ms. Prodan stated in the email that Plaintiff was "screaming" at Miss Martin at Hanover Junction on August 2, 2015.

235. Upon information and belief, Ms. Prodan additionally made accusations against Mr. Billet for inappropriate conduct towards a minor regarding Miss Martin. Ms. Prodan subsequently told the volunteer Coordinator, Bruce Warch, that she was directed by Mr. Gotwols to "get some dirt on Mike (Billet)."

236. It is believed that Bruce Warch informed Alex Horneman, Mr. Billet's supervisor, about Ms. Prodan's statements regarding the directive from Mr. Gotwols.

237. Upon information and belief, Mr. Billet reported the false accusations of inappropriate behavior to the Southern Regional police in York County.

238. Upon information and belief, after hearing of the accusations against Mr. Billet by Ms. Prodan, Holly Martin and her mother Debra Adams ("Mrs. Adams") both provided a written statement that Mr. Billet did not act inappropriately towards Miss Martin.

239.  On September 9, 2015, Mrs. Adams filed an incident report with the Northern Regional Police in York County against Ms. Prodan.

240.  In filing the incident reports with the Northern Regional Police, Mrs. Adams included quotes from Ms. Prodan stating that she (Ms. Prodan) was the reason that Plaintiff was banned from the train in September 2014, because she (Ms. Prodan) was "used" by Mr. Gotwols to "set (Brenda) up so that he could make her stay off the train."

241.  Upon information and belief, Mrs. Adams also reported that while Ms. Prodan was directed to "get dirt on Mr. Billet" by Mr. Gotwols, Ms. Prodan also began circulating rumors that Mr. Billet had been taking nude photos of Plaintiff and showing these photos to Miss Martin on his phone.

242.  No such photos were ever taken of Plaintiff and no nude photos of Plaintiff exist.

243.  Upon information and belief, the two incident reports from the police and the statements written by Mrs. Adams regarding Ms. Prodan have been shared with Mr. Gotwols, Mr. Anderson and Mr. Noll. Nonetheless, it is believed that Phyllis Prodan remains an employee at SIH and has not received any disciplinary action for her conduct.

244.  While working her shift as a greeter for the York Recreation and Parks during the New Freedom Festival on September 19, 2015, Plaintiff

noticed that Mr. Gotwols was walking in front, behind, and to the side of her in a very threatening manner.

245.  Mr. Gotwols also entered the New Freedom train station, walked to the front and back for no apparent reason, brushing past and very close to Plaintiff.

246.  Plaintiff believes and therefore avers that Mr. Gotwols was intentionally attempting to intimidate Plaintiff.

247.  Plaintiff also walked around the street festival at the end of her shift and took note that at one point in the day, Mr. Gotwols was following very close behind her as she walked along the vendor stalls.

248.  During her shift at the New Freedom train station during the New Freedom Festival, Plaintiff interacted with over 499 visitors. A high percentage of visitors to the museum that day entered with questions about the SIH train runs and the history surrounding the rails.

249.  While stopped at Hanover Junction station during a bike ride on October 18, 2015, Plaintiff observed Mr. Gotwols standing on the train platform taking pictures of her while she was speaking to two volunteers from SIH.

250. On or about October 30, 2015, Kent Courtney, a frequent entertainer on the SIH trains, reported to Mr. Billet, that he has never heard Plaintiff speak about SIH the way that "they talk about her."

251. On November 7, 2015, Plaintiff's reenacting regiment was invited to participate in a reenactment "raid" on the train. Plaintiff could not participate because of her ban from the train, but decided to ride her bike along the trail that day instead.

252. At Glen Rock, Plaintiff encountered her regiment waiting for the train. She said hello to all of the reenactors and continued her ride.

253. Later in the day, at Hanover Junction, she again encountered her regiment.

254. She approached one member, Richard Anderson, who extended his arms for a hug.

255. When Plaintiff gave Mr. Anderson a greeting and hug he apologized that he could not hug Plaintiff in greeting earlier in the day, "but Bob (Mr. Gotwols) was watching."

256. During 2015, Plaintiff's Narrative works continued to be the primary entertainment on all train runs, including those runs that had other/additional entertainment, such as musicians, or other speakers. During

2015, SIH also began advertising on their website that there would be "a narrator on every train".

257. During 2015, SIH utilized Plaintiff's idea for snacks on the train. SIH employees now pack baskets with snacks for each run, and sell them to patrons riding the trains.

258. Plaintiff is still barred from riding on the SIH train, and continues to lose income on her books sales.

259. Plaintiff is still unable to secure any narration positions with any charters renting SIH equipment or through any other tourist railroads in the area and, therefore, suffers a monetary loss related to the use of her costuming, and a loss to the reputation of her skills as an entertainer.

260. Plaintiff continues to suffer humiliation due to her termination and due to the slanderous accusations made about her which disparaged her personal reputation.

261. SIH continues to benefit from Plaintiff's knowledge of Civil War history as Plaintiff works as a greeter providing information and answering questions at both museums along the SIH route.

262. Plaintiff continues to suffer harassment on the part of the SIH management in an ongoing manner. Plaintiff's interpersonal relationships

are also negatively impacted by individuals who fear retribution due to their relationship with Plaintiff.

263.  To date, Plaintiff is unaware of reports of abuse on the part of Mr. Gotwols having been addressed by the Board of Directors at SIH.

## COUNT I

### (Federal Copyright Infringement)

### Violation of 17 U.S.C. §501, *et seq.*

264.  Paragraphs 1 through 263 above are incorporated herein by reference as if set forth below in their entirety.

265.  Plaintiff has properly applied to register, and she owns and controls the copyrights to her narrations.  *See* copyright registrations attached hereto as Exhibit "C" and "D."

266.  Plaintiff is, and at all times material hereto has been, the copyright owner of her narrations and any derivative works therefrom and is entitled and authorized to protect her narrations against copyright infringement, including the enforcement of copyright actions.

267.  Plaintiff secured the exclusive rights pursuant to 17 U.S.C. §106, *inter alia*, to reproduce the copyrighted work, to prepare derivative works based upon the copyrighted work, and to perform the copyrighted work publicly.

268.  Defendant gained access to Plaintiff's copyrighted narrations during Plaintiff's time spent at SIH.

269.  No formal contracts, licensing agreements, or compensation agreements were entered into between Plaintiff and Defendant for Defendant's use of Plaintiff's narrations.

270.  Neither were Plaintiff's copyrighted narrations works made for hire or subject to work made for hire agreements.

271.  Defendant, however, used and continues to use Plaintiff's narration for its business purposes, without providing compensation to Plaintiff, despite Plaintiff demanding that such use cease.

272.  Defendant is thus infringing upon Plaintiff's statutory copyright by substantial copying, reproducing, performing, broadcasting, making and distributing, or authorizing the making and distributing of the narrations and/or derivative marks, and by participating in and furthering such infringing acts.

273.  Plaintiff has not authorized Defendant to copy, reproduce, perform or otherwise use Plaintiff's copyrighted work without compensation to Plaintiff.

274.  Alternatively, on or about September 14, 2014, when she sent her cease and desist email, Plaintiff terminated any non-exclusive implied

license Defendant may have had to copy, distribute, and perform the narrations, or prepare derivative works, and informed Defendant that any further use of the narrations would be a willful infringement of Plaintiff's copyrights.

275. Subsequent to receipt of the termination, on information and belief, without authorization from Plaintiff, or any right under law, Defendant has unlawfully distributed Plaintiff's narrations, in violation of the Copyright Act, 17 U.S.C §106.

276. Defendant is directly liable for these acts of infringement under the Copyright Act.

277. The foregoing acts of infringement by Defendant have been willful, intentional and purposeful, and in disregard of and indifferent to Plaintiff's rights.

278. Defendant did not seek or obtain any permission, consent or license from Plaintiff for the copying, reproduction, performance or use of the narrations.

279. Defendant has directly infringed on Plaintiff's copyrighted narrations.

280. Defendant's infringing acts are direct, contributory and/or by inducement.

281. Defendant's infringing acts have damaged Plaintiff in an amount yet to be determined, and have unjustly enriched the Defendants in an amount yet to be determined.

282. Defendant has received ill-gotten financial gain from their infringement of the narrations and liable for all damages suffered by Plaintiff.

283. Upon information and belief, Defendant generated $1,778,262.00 in total revenue in 2013, some or all of which is related to train ticket sales and the on-board entertainment programs.

284. Plaintiff is not in possession of comparable revenue figures for 2014 or 2015, but it is believed and therefore averred that those figures should be at least the amount of the 2013 revenue.

285. The Defendant had actual knowledge of the infringement, knew that Plaintiff did not or would not approve of their infringing use, performance, recording, reproduction and distribution of the narrations, except to the extent performed by Plaintiff herself, and thus the infringement was willful and deliberate.

286. Plaintiff has suffered, and will continue to suffer, losses in an amount not yet ascertained.

287.  In addition to Plaintiff's actual damages, Plaintiff is entitled to receive profits made by Defendants from their wrongful acts pursuant to 17 U.S.C. §504.

288.  In the alternative, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. §504(c), which should be enhanced by 17 U.S.C. §504(c)(2) because of Defendant's willful copyright infringement.

289.  Plaintiff does not have an adequate remedy at law for Defendant's wrongful conduct in that Plaintiff's copyright is unique and valuable property which has no readily determinable market value and Defendant's wrongful conduct and the damages resulting to Plaintiff therefrom, is continuing.

290.  Defendant's acts of copyright infringement have caused Plaintiff irreparable harm and Defendant continues to commit these acts.

291.  Plaintiff is entitled to injunctive relief under 17 U.S.C. §502 enjoining any use or exploitation by Defendant of the narrations, and to an order under 17 U.S.C. §503 that any of Defendants infringing products be impounded and destroyed.

292.  Plaintiff is also entitled to recover her attorneys' fees and costs of suit under 17 U.S.C. §505.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter a judgment in her favor in the amount of Defendant's profits made as a result of using Plaintiff's copyrighted material or, in the alternative, an amount of statutory damages multiplied by the number of copies, public performances, and/or derivative works made by Defendant in addition to attorneys' fees and costs of suit. In addition, Plaintiff requests an Order prohibiting Defendant from making further use of Plaintiff's copyrighted works without authorization and payment of license fees.

## COUNT II

### (Federal Copyright Infringement)

### Violation of 17 U.S.C. §1202(b)

293. Paragraphs 1 through 292 above are incorporated herein by reference as if set forth below in their entirety.

294. When Plaintiff created her Narratives, she incorporated copyright management information into these works to identify the title of her work, that she was the author of the works, and the date it was created.

295. It is believed and therefore averred that Defendant removed any and all copyright management information contained in the Narratives before making copies of same and/or before making derivative works from them.

296. Defendant's removal of Plaintiff's copyright management information was done intentionally and willfully for purposes of concealing Plaintiff's role in the creation of said Narratives and to have readers/listeners believe SIH created said Narratives.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter a judgment in her favor in the amount of profits realized by Defendant in making use of Plaintiff's narrations and/or statutory damages provided by 17 U.S.C. §1203(c).

## COUNT III

### (Common Law Copyright Infringement – In the Alternative)

297. Paragraphs 1 through 296 above are incorporated herein by reference as if set forth below in their entirety.

298. In the alternative, the aforesaid unauthorized uses of Plaintiff's narrations infringes upon Plaintiff's copyright protections under the common law of the Commonwealth of Pennsylvania.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter a judgment in her favor in the amount of profits realized by Defendant in making use of Plaintiff's narrations and/or the reasonable royalties that should have been paid, including attorneys' fees and Court costs.

## COUNT IV

## (Unfair Competition)

299.  Paragraphs 1 through 298 above are incorporated herein by reference as if set forth below in their entirety.

300.  Plaintiff is unable to make use of or benefit financially from her copyrighted works, either as a volunteer narrator making tips, or as a contracted employee earning a wage for narrating.

301.  Plaintiff is also no longer able to sell her book, which was specifically written to reflect the history of this railroad, at the Steam into History gift shop, or on the Steam into History trains.

302.  Defendant also gave permission for the sale of a DVD in their gift shop that used Plaintiff's copyrighted material as the basis for a portion of the script.

303.  Defendant intended to and did destroy Plaintiff's business opportunities connected to her train narrations with Steam into History, or with other companies that ran on or near that line, or in the same community.

304.  Defendant has made no effort to replace Plaintiff's narrative with other forms of entertainment on the train, thereby signaling their intention to continue using Plaintiff's narrative as the sole entertainment on the train in an ongoing manner.

305.  Defendant's actions are continuing in nature and damages will continue to accumulate if immediate relief is not granted.

306.  It would be inequitable to allow Defendant to continue using Plaintiff's narrations without adequate compensation and attribution.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter a judgment in her favor in the amount of profits realized by Defendant in making use of Plaintiff's narrations and/or the reasonable royalties that should have been paid, as well as damages related to lost profits and Plaintiff's lost business opportunities, including attorneys' fees and Court costs.

## COUNT V

### (Unjust Enrichment)

307.  Paragraphs 1 through 306 above are incorporated herein by reference as if set forth below in their entirety.

308.  Defendant is benefitting from the use, performance and distribution of Plaintiff's copyrighted narratives as their primarily source of entertainment.

309.  During the inaugural year of 2013, there were approximately 286 train runs. During the second year of operation in 2014, there were approximately 377 train runs for a total of approximately 663 runs for 2013-

2014.  Passenger capacity on runs ranged between 87-128 passengers for each run, with an adult ticket price approximated between $20.00 and $30.00 each.

310.  In 2015, there were approximately 300 scheduled train runs with a capacity of 128 passengers per run, and an approximate ticket price of between $25.00 and $27.00 per adult ticket.

311.  Plaintiff's narration was used as the primary entertainment on all runs, even runs including other musical entertainment.

312.  Defendant benefitted from the use of Plaintiff's likeness on catalogues, handbills, and schedules containing photographs of Plaintiff. Defendant utilized Plaintiff's likeness on their social media outlets.

313.  Defendant benefitted from the creation and implementation of Plaintiff's income stream through her supplemental business "Snacks on the Tracks." Defendant continues to use Plaintiff's business idea by selling snacks on the train from baskets, during the ride.

314.  Defendant benefitted from the creation and sale of Plaintiff's souvenir book "Tales Along the Tracks."

315.  Defendant benefitted when Plaintiff used her skills and enthusiasm to train other narrators.  Plaintiff also made herself available as a reenactor/narrator at all times in the event that coverage was needed or if

a special event was created. Further, Defendant benefitted from Plaintiff's skill with the customers on the train, many of whom came back repeatedly to hear Plaintiff deliver her narrations.

316.  Defendant continues to benefit from Plaintiff's research and knowledge base regarding the railroad, through her interactions with patrons at the Hanover Junction and New Freedom train stations in the capacity of a docent/greeter.

317.  It is unconscionable that Defendant should continue to benefit from Plaintiff's hard work, without adequate compensation to Plaintiff.

318.  Therefore, Defendant has been unjustly enriched.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter a judgment in her favor in the amount of profits realized by Defendant in making use of Plaintiff's narrations, likeness and business ideas and/or the reasonable royalties that should have been paid, including attorneys' fees and Court costs.

## COUNT VI

### (Quantum Meruit)

319.  Paragraphs 1 through 318 above are incorporated herein by reference as if set forth below in their entirety.

320. Plaintiff has conferred a benefit upon Defendant by way of Plaintiff's services and performance as a train narrator for Defendant's business benefits and purposes.

321. Plaintiff was one of the first volunteers to offer her services at SIH.

322. Plaintiff volunteered for a period of over one year in the position of train narrator, while all other train narrators were paid.

323. In her second year of service, Plaintiff requested compensation for her services as a train narrator, and was offered $8.00 per hour for such.

324. It is believed that this is less than what was paid to other narrators at SIH.

325. While a narrator at SIH, Plaintiff paid for period costuming and mileage and was not reimbursed for those expenses.

326. Plaintiff paid $7,771.00 for period correct costuming during the time period of June-December 2013 and January-July 2014, up to the time of her termination.

327. During the year in which she volunteered her services, Plaintiff put 3,568 miles on her vehicle traveling to SIH in order to work her volunteer shifts on the train.

328. The value of these miles using the Internal Revenue Service reimbursement rate for 2014 ($.56 per mile) is $1,998.08

329. Plaintiff was the first narrator trained and available to SIH, and remained the only narrator for several months in their inaugural year.

330. Defendant provided Plaintiff with no compensation for a period from June 2013 through March 2014, despite all subsequent narrators receiving compensation for their services.

331. Plaintiff was approached by Board Member John Riggle in January 2014, who requested that Plaintiff create an "income stream" for the company.

332. To that end, she researched and developed "Snacks on the Tracks."

333. Plaintiff provided snacks, sales baskets, money boxes and created a sales system at her own expense in order to support the company.

334. Plaintiff also researched and wrote a souvenir book "Tales Along the Tracks" which she consented to a portion of those profits going to SIH.

335. Expenses for the research and writing of that book exceeded $2,148.00 and were paid for solely by Plaintiff.

336. Similar books at Strasburg Railroad, and Cass Railroad have sold since prior to, or beginning in 1971. Plaintiff believed that her souvenir

book would be a good source of income, for her and SIH, well into her retirement.

337. Additionally, Plaintiff worked to create several book signing events in the community at local historical societies and railroad enthusiasts clubs in order to introduce and sell her book "Tales Along the Tracks."

338. Events such as these also provided free marketing for Defendant.

339. Plaintiff is entitled to receive the reasonable value of her services, reimbursement for clothing, travel, and other related expenses.

340. Plaintiff is also entitled to profits from the anticipated sales of her book.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter a judgment in her favor in the amount of profits realized by Defendant in making use of Plaintiff's narrations, likeness and business ideas and/or the reasonable royalties that should have been paid, including attorneys' fees and Court costs.

## COUNT VII

### (Slander Per Se)

341. Paragraphs 1 through 349 above are incorporated herein by reference as if set forth below in their entirety.

342. Defendant and its agents made repeated defamatory remarks about Plaintiff by suggesting that she was involved in inappropriate relationships with her colleagues, by repeating remarks to others affiliated with SIH, as well as broadcasting such statements publicly.

343. Specifically, Defendant and its agents stated that Plaintiff had inappropriate relationships with a married man, Mr. Billet, and also, Mike Zortman, while suggesting that these circumstances contributed to her being unwelcome at SIH.

344. Such defamatory statements suggested that Plaintiff engaged in serious sexual misconduct and conduct incompatible with Defendant's business.

345. Such statements also tarnished Plaintiff's reputation as it relates to her capacity as an educator and historian, her two main passions and sources of employment.

346. These comments were made at SIH's business location, so that colleagues and members of the community had the opportunity to hear what was being said regarding Plaintiff.

347. It is clear that such defamatory remarks were directed towards Plaintiff.

348. It is also clear that any recipient of Defendant's defamatory statements would understand that such comments were intended to defame Plaintiff and cause harm to her reputation and character within the community.

349. Upon learning of such defamatory statements, Plaintiff was humiliated, outraged and has suffered from a loss of reputation in the community.

350. At this time it is impossible to ascertain on how many occasions these defamatory statements were heard, as the same were spoken in a public venue.

351. At this time it is also unknown on how many occasions the Defendant has either published or spoken such defamatory comments to others.

352. Accordingly, Plaintiff is unable to completely assess what damages have been sustained as a result of these defamatory remarks.

WHEREFORE, Plaintiff respectfully requests that this Court to enter judgment in her favor and against Defendant in an amount in excess of $75,000.00, plus interest, costs, and attorneys' fees, and to award any other relief this Court deems appropriate.

## COUNT VIII

### (Promissory Estoppel)

353.  Paragraphs 1 through 352 above are incorporated herein by reference as if set forth below in their entirety.

354.  Plaintiff presented her souvenir book proposal to Defendant at a meeting on February 17, 2014.

355.  Thereafter, Plaintiff was encouraged to complete the books so that SIH could sell it in their bookstore.

356.  Plaintiff spent a period of three months writing and producing the book for SIH.

357.  Defendant represented that SIH would purchase books from Plaintiff for sale in the SIH gift shop and would continue to do so as long as the books would sell.

358.  Plaintiff was also informed that she would be permitted to sell her books while narrating on the train runs.

359.  Based on this representation, Plaintiff placed orders with a book printer and incurred various expenses to have the book published.

360.  As a result of her termination and the cancellation of book sales, Plaintiff can no longer earn the revenue she expected.

361. Therefore, Defendant should compensate Plaintiff for her reliance on its actions to avoid injustice.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor in an amount that will fairly compensate her for losses sustained and anticipated profits she would have realized if sales were continued as promised, including interest, costs, and attorneys' fees and any other relief this Court deems appropriate.

SHUMAKER WILLIAMS, P.C.

Dated: November 30, 2015    By  /s Evan C. Pappas
                                 Evan C. Pappas, PA I.D. #200103
                                 Kenneth J. McDermott, PA I.D. #205555
                                 P.O. Box 88
                                 Harrisburg, PA  17108
                                 (717) 763-1211
                                 *Attorneys for Plaintiff*

:300000-21-1918